UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENRIQUE TORRES,<br><br>        Petitioner,<br><br>    v.<br><br>PAUL LOZANO,<br><br>        Respondent. | No.  2:18-cv-3136 MCE KJN P<br><br>FINDINGS & RECOMMENDATIONS |

I. Introduction

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2015 conviction for first degree burglary.  Petitioner claims his due process rights were violated by a jury instruction that permitted the jury to consider the witness' level of certainty in evaluating eyewitness identification, and that there was insufficient evidence that the house was inhabited.  After careful review of the record, this court concludes that the petition should be denied.

II. Procedural History

On September 17, 2015 a jury found petitioner guilty of first degree burglary.  (ECF Nos. 13-1; 21-1 at 113.)  In a bifurcated proceeding, the trial court found petitioner previously sustained a serious felony offense qualifying as a strike under California's Three Strikes Law, and had also served two prior prison terms.  (ECF Nos. 13-1, 13-2 at 1.)

On November 6, 2015, petitioner was sentenced to fifteen years in state prison. (ECF No. 21-1 at 11.)

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District. The conviction was affirmed. (ECF No. 13-2.) Petitioner filed a petition for review in the California Supreme Court on April 4, 2018, which was denied on June 13, 2018. (ECF Nos. 13-3, 13-4.)

On December 3, 2015, petitioner filed a petition for writ of habeas corpus in the Sacramento County Superior Court. (ECF No. 21-8.) On January 4, 2016, the superior court dismissed the petition for lack of jurisdiction because petitioner's case was pending appeal. (ECF No. 21-9.)

Petitioner filed the instant petition on December 4, 2018. (ECF No. 1.)

On May 14, 2019, petitioner's second claim, which was unexhausted, was voluntarily withdrawn by petitioner, and struck by the undersigned. (ECF No. 18.)

III. Facts[1]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California appellate court provided the following factual summary:

> On a Saturday evening in May 2015, two men burglarized a house in the Arden-Arcade area of Sacramento. The homeowner (victim) and her daughter lived in the house, but were not home at the time. The house was in the process of being sold, so they routinely spent weekends at a relative's house to facilitate potential buyers' ability to see the house.
>
> Two testifying witnesses saw the burglary occur. One of these witnesses, S.J., positively identified defendant as one of the burglars and did so with certainty. This identification, coupled with the fact defendant was detained in the area a short time after the burglary because he matched the general description provided to law enforcement officers, was the only evidence connecting him to the crime. Because defendant challenges an instruction directing the jury to consider the certainty with which an eyewitness makes an identification in assessing the reliability of that identification, we describe in some detail S.J.'s identification of defendant, placing it in the context of each witness's account of the burglary.

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Enrique Torres, No. C080759 (Feb. 22, 2018), a copy of which was lodged by respondent as Lodged Document 2 at 2-5. (ECF No. 13-2 at 2-5.)

2

The victim's house was located at the corner of Bell Street and Santa Anita Drive. The neighbor across the latter street, T.B., testified that he pulled into his driveway at around 6:30 p.m. and saw two men pushing an empty Home Depot platform cart up the victim's driveway. He lost sight of the men as they got to the house. A few minutes later, he saw the same men coming back down the driveway with what appeared to be an appliance on the cart. While he did not get a close enough look to identify either man, he described them as "dark complected," "either ... [B]lack or Hispanic," with an "average" height and build. He also testified one of the men might have gotten onto a bicycle while the other pushed the cart north on Bell Street.

S.J. and his girlfriend were riding their bicycles down Bell Street when the burglars were making their way down the driveway. As S.J. described in his testimony, "two Hispanic males were coming down the driveway with an orange cart with a washer and dryer on it. The washer and dryer fell off at the bottom of the driveway, and they were struggling to get both items back on the cart." S.J. became suspicious when he nodded to the men as he passed by and asked them how they were doing, but received no response. He then looked up the driveway and saw the gate on the side of the victim's house and side door to the garage looked like they had been "kicked open." At that point, S.J. stopped and told the men he would be taking the cart, but "they immediately took off down the street." As S.J. described, both men got onto bicycles and towed the appliances north on Bell Street, each man holding onto the cart with one hand. When they got a short distance up the street, they stopped, unloaded the appliances from the cart, and carried them through a gap in some oleander bushes dividing Bell Street from a frontage road. Rather than follow in pursuit, S.J. called 911 and reported the burglary to law enforcement authorities. S.J. testified the men were wearing black shorts, white knee-high socks, tennis shoes, and white shirts, one sleeveless and the other a plain t-shirt. He also explained that he saw their faces clearly because it was still light outside and he was "probably closer than three feet" away when he and his girlfriend passed by on their bicycles.

Sheriff's deputies arrived about 15 minutes later. The Home Depot cart was found in a drainage ditch between Bell Street and the frontage road where S.J. saw the men disappear with the appliances between the oleanders. From that location, one of the deputies saw defendant walking towards him from the south along the frontage road. Defendant, a Hispanic male, was wearing charcoal gray shorts, white crew socks, tennis shoes, a white t-shirt, and a baseball cap. He was detained as matching the general description provided to the 911 operator.

The washer was found a short distance north of where defendant was detained, in the side yard of a house facing the frontage road. The gate providing access to this yard was not locked and could easily be opened from the road. About 15 minutes before deputies arrived in the neighborhood, J.G., a neighbor three houses south of the house where the washer was found, heard yelling and what sounded like "hard wheels on the street" outside. He came outside to investigate,

> saw someone pushing "a big white box" toward the other house, and then went back into his house. Less than 10 minutes later, he again heard yelling and returned to his front yard, where he saw a Hispanic male without a shirt walking past his house south on the frontage road. The man appeared to be "motioning and yelling to someone" further south on the frontage road. J.G. also testified at trial, but could not identify the person he saw walking past his house and did not see the person to whom that person was apparently yelling and motioning. Nor did he see where the shirtless man went once law enforcement officers began arriving on the scene.
>
> As mentioned, defendant was detained on the frontage road several houses south of J.G.'s house. A helicopter that was also dispatched to the area located a second person matching the general description a short distance north of where the washer was found, but deputies responding to that location were unable to find the potential suspect. The dryer was also never located.
>
> About an hour after the burglary, S.J. participated in an in-field show up and positively identified defendant as one of the burglars. It was still light outside when the show up occurred. S.J. viewed defendant for about 30 seconds before making the identification, asking to see him from the front, side, and back, which the sheriff's deputies accommodated. As one of the deputies testified, S.J. seemed confident in his identification and said defendant's height, hair style, facial hair, skin tone, t-shirt, shorts, socks, and shoes were the same. S.J. confirmed during his testimony that he was confident in his identification of defendant, adding that defendant's "mannerism," which he clarified meant, "how he carried himself," was also consistent with that of one of the burglars. When asked whether he could positively identify anyone in the courtroom, S.J. said he "believe[d] it would be the gentleman in the blue shirt," indicating defendant, but he could not "say definitively."
>
> Finally, we note defendant's fingerprints did not match any of the latent prints obtained from various places in the victim's house, garage, and back yard. The washer was processed for fingerprints prints as well, but none were found.

People v. Torres, slip. op. at 2-5 (ECF No. 13-2 at 2-5).

IV. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

////

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

5

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous"'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

////

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 298 (2013) (citing Richter, 562 U.S. at 98). If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny

7

1  relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could

2  have supported the state court's decision; and then it must ask whether it is possible fairminded

3  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

4  decision of [the Supreme] Court." Id. at 101. The petitioner bears "the burden to demonstrate

5  that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d

6  925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

7      When it is clear, however, that a state court has not reached the merits of a petitioner's

8  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

9  habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

10 F.3d 1099, 1109 (9th Cir. 2006).

11 V.  Petitioner's Claims

12     A.  First Claim: Jury Instruction Error

13     Petitioner claims that his due process rights were violated by jury instruction CALCRIM

14 No. 315, which permitted the jury to consider the sole eyewitness' level of certainty in evaluating

15 eyewitness identification. Petitioner argues there was no physical evidence tying petitioner to the

16 crime, and the eyewitness and the prosecutor went over the level of the eyewitness' certainty

17 "again and again." (ECF No. 1 at 6.) Petitioner points to the jury's questions during deliberation

18 as evidence that the certainty factor was critical to the verdict, specifically their question, "Does a

19 single credible eyewitness without corroborating physical evidence satisfy the burden of proof of

20 guilty beyond a reasonable doubt?" (ECF No. 1 at 6.) Petitioner argues that "[i]t is well

21 established that the correlation between the certainty of an eyewitness and the accuracy of his

22 identification is weak at best." (Id.)

23     Respondent counters that petitioner cites no Supreme Court authority clearly establishing

24 a constitutional right to a criminal trial free from instructions that indicate an eyewitness is more

25 believable if certain that the identification is correct, and that fair minded jurists could argue that

26 the two U.S. Supreme Court cases relied upon by the state appellate court foreclose petitioner's

27 claim.

28 ////

The last reasoned rejection of petitioner's first claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> Defendant contends the trial court prejudicially erred and violated his federal constitutional rights by instructing the jury with a portion of CALCRIM No. 315 directing the jury to consider the level of certainty with which an eyewitness made an identification in evaluating the accuracy of that identification. Defendant did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under People v. Watson (1956) 46 Cal.2d 818, 299 P.2d 243. [Citation.]" (People v. Anderson (2007) 152 Cal.App.4th 919, 927.) Because our Supreme Court has previously rejected this contention, we are bound to conclude there was no error.
>
> As delivered to the jury in this case, CALCRIM No. 315 provides: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness' ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? Did the witness give a description, and how does that description compare to the defendant? How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? *How certain was the witness when he or she made an identification?* [¶] Are the witness and the defendant of different races? Was the witness able to identify other participants in the crime? [¶] Was the witness able to identify the defendant in a photographic or physical lineup? Were there any other circumstances affecting the witness' ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (Italics added.)

////

As our Supreme Court explained in People v. Sanchez (2016) 63 Cal.4th 411 (Sanchez), the court "specifically approved" CALCRIM No. 315's predecessor, CALJIC No. 2.92, "including its certainty factor" in People v. Wright (1988) 45 Cal.3d 1126 (Wright), and "reiterated the propriety of including this factor" in People v. Johnson (1992) 3 Cal.4th 1183 (Johnson). (Sanchez, supra, 63 Cal.4th at p. 462.) After noting certain out-of-state cases have disapproved instructing on the certainty factor in light of "scientific studies that conclude there is, at best, a weak correlation between eyewitness certainty and accuracy" (id. at p. 461; see, e.g., State v. Mitchell (2012) 294 Kan. 469; Commonwealth v. Santoli (1997) 424 Mass. 837), the Sanchez court declined to reexamine its previous holdings, explaining there were a number of identifications in the case, some certain and some uncertain, and therefore it was "not clear that even those [out-of-state] cases would prohibit telling the jury it may consider this factor" in a case where the defendant "would surely want the jury to consider how uncertain some of the identifications were." (Sanchez, at p. 462.) The court further stated: "Any reexamination of our previous holdings in light of developments in other jurisdictions should await a case involving only certain identifications." (Ibid.)

Here, as defendant accurately observes, the only witness who identified him as one of the burglars did so with certainty during the in-field show up and reiterated how certain he was about that identification during his trial testimony. While, as in Sanchez, supra, 63 Cal.4th 411, defendant did not object to the eyewitness identification instruction or request modification of the instruction to remove the certainty factor, this instructional error claim is not forfeited if the error affected his substantial rights, i.e., resulted in a miscarriage of justice. (People v. Anderson, supra, 152 Cal.App.4th at p. 927.) Unlike Sanchez, where there was strong evidence of the defendant's guilt independent of the identification evidence, and where the defendant may well have benefitted from the instruction because it highlighted those identifications that were less than certain, in this case, the only evidence against defendant was the identification and the fact he was detained in the area shortly after the burglary matching the general description that same witness provided to the 911 operator. However, because we are bound by our Supreme Court's decisions in Sanchez, supra, 63 Cal.4th 411 Wright, supra, 45 Cal.3d 1126 and Johnson, supra, 3 Cal.4th 1183 we must conclude there was no error in instructing the jury with CALCRIM No. 315, including the certainty factor. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.) We decline to address whether or not instructing on this factor, assuming error, would have affected defendant's substantial rights.

////

> Nor may we conclude instructing on the certainty factor violated defendant's federal constitutional right to due process. In <u>Neil v. Biggers</u> (1972) 409 U.S. 188 [34 L.Ed.2d 401], the United States Supreme Court identified several factors to consider in determining the reliability of an eyewitness identification, including "the level of certainty demonstrated by the witness. . . ." (<u>Id.</u> nat pp. 199-200.) More recently, in <u>Perry v. New Hampshire</u> (2012) 565 U.S. 228 [181 L.Ed.2d 694], addressing the defendant's due process argument concerning the reliability of an identification, the high court cited the <u>Neil</u> factors, including certainty, and held these factors may properly be considered in evaluating the reliability of an eyewitness identification. (<u>Id.</u> at pp. 725-726 & fn. 5.) We are, of course, bound by these decisions as well. (<u>Auto Equity Sales, Inc. v. Superior Court</u>, supra, 57 Cal.2d at p. 455.)
>
> The trial court did not err in instructing the jury with CALCRIM No. 315 concerning its evaluation of eyewitness testimony.

<u>People v. Torres</u>, <u>slip op.</u> at 5-8.

Federal habeas corpus relief does not lie for errors of state law; and a claim that a state court failed to follow its own state law in regard to jury instructions given at trial does not necessarily invoke a federal constitutional question. See <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991). In order to warrant federal habeas relief, a challenged jury instruction must violate due process to the extent that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" <u>Id.</u> (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973)); <u>Dixon v. Williams</u>, 750 F.3d 1027, 1033 (9th Cir. 2014).

"The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977). A defendant is not entitled to a specific instruction provided that other instructions, in their entirety, adequately inform the jury of the defense theory of a case. <u>United States v. Del Muro</u>, 87 F.3d 1078, 1081 (9th Cir. 1996).

A "slight possibility" that the jury misapplied the instruction is not enough to warrant habeas relief. <u>Waddington v. Sarausad</u>, 555 U.S. 179, 191 (2009). Rather, an ambiguous

1    instruction violates due process only when there is a "reasonable likelihood" that the jury has
2    applied the challenged instruction in a way that violates the Constitution.  Waddington, 555 U.S.
3    at 190-91; Estelle, 502 U.S. at 72 & n.4 (1991).  In making this determination, the reviewing
4    court must not view the instruction in artificial isolation, but must consider it in the context of the
5    trial record and the instructions as a whole.  Estelle, 502 U.S. at 72.  In other words, the court
6    must evaluate jury instructions in the context of the overall charge to the jury as a component of
7    the entire trial process.  See Cupp, 414 U.S. at 147 (explaining that the challenged instructional
8    error must be assessed not by focusing on the alleged faulty instruction in isolation, but by
9    considering its effect in the context of the overall charge).

10    The state appellate court was not objectively unreasonable in denying the jury instruction
11    claim.  CALCRIM No. 315 is written in neutral terms and is only one of many nonexclusive
12    factors the jury could consider in weighing the accuracy of the identification evidence.  (ECF No.
13    21-4 at 73-74.)  Indeed, the jury instruction begins by instructing the jury that it "must decide
14    whether an eyewitness gave truthful and accurate testimony."  (ECF No. 21-4 at 73.)  Petitioner
15    fails to identify anything in the record that demonstrates the eyewitness identification instruction
16    so infected the trial that his conviction violated due process.

17    Moreover, the Supreme Court has held that

> the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, *the level of certainty demonstrated by the witness at the confrontation*, and the length of time between the crime and the confrontation.

22    Biggers, 409 U.S. at 199-200 (emphasis added).  Because some of the factors listed in CALCRIM
23    No. 315 are identified by the Supreme Court as essential factors in evaluating misidentification,
24    instructing the jury with CALCRIM No. 315 cannot amount to a federal due process violation.
25    The state court reasonably determined that petitioner's due process rights were not
26    violated by the use of CALCRIM No. 315.  Accordingly, petitioner's first claim should be denied.
27    ////
28    ////

  B. <u>Third Claim:  Insufficiency of the Evidence</u>

  Petitioner claims that there was insufficient evidence to demonstrate that the house was inhabited to support the first-degree burglary conviction.  Petitioner contends that the owner of the house was selling her home, which was in escrow, and had already moved into her new home with her relatives.  In addition, petitioner claims only a few belongings remained in the home, which lacked items ordinarily required, such as food, kitchen utensils, bathroom items, or clothes in bedroom closet.  Neighbors thought the house was vacant because they did not see signs it was inhabited.  The owner testified that she sometimes stayed overnight, but did not testify when she last stayed there or how many nights she usually stayed there, whether she intended to return, or explain why she could spend the night there if the house was in escrow and she had already moved to her new home.

  Respondent argues that the state court did not unreasonably apply <u>Jackson</u>.  Petitioner does not dispute that the home owner still stayed at least part-time at the house, and that her belongings remained in the house.  Thus, a fair minded jurist could agree that the residence was inhabited, as defined under California law.  In addition, petitioner's claim that the homeowner's evidence should be disregarded in light of the neighbors' testimony that the home appeared deserted, constitutes a reweighing of the evidence in petitioner's favor, which violates <u>Jackson's</u> requirement that all conflicting evidence must be resolved in favor of the verdict.

  The last reasoned rejection of petitioner's claim is the decision of the California appellate court on petitioner's direct appeal.  The state court addressed this claim as follows:

> Defendant also claims his conviction must be reduced to second degree burglary because the evidence was insufficient to establish the house was inhabited at the time of the entry. He is mistaken.
>
> "Every person who enters any house ... with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.) "Every burglary of an inhabited dwelling house ... is burglary of the first degree." (§ 460, subd. (a).)  "'[I]nhabited' means currently being used for dwelling purposes, whether occupied or not." (§ 459.)
>
> "Case law has defined what constitutes an 'inhabited dwelling house' within the meaning of the burglary statutes. '[C]ourts have explained that the term "inhabited dwelling house" means a "structure where

13

people ordinarily live and which is currently being used for dwelling purposes." '[Citation.] The term 'has been analyzed in terms of whether the dwelling was being used as a residence.' [Citation.] Factors relevant to determining whether a house is 'inhabited' include whether the owner or occupant sleeps in the house, keeps personal belongings there, and intends to continue living there. [Citations.] (People v. Tessman (2014) 223 Cal.App.4th 1293, 1298 (Tessman).)

In Tessman, the Court of Appeal held the defendant was properly convicted of first degree residential burglary where she went to an open house viewing and stole some items from the master bedroom. As the court explained, the owner of the house still lived there despite the fact she placed the house on the market and was temporarily absent during the open house. Her belongings remained there while the house was on the market for sale. She stayed there the night before the open house, returned home afterwards, and did not move out of the house until it was sold. Her testimony to that effect "established [she] was using the house as her residence, and it therefore qualified as an 'inhabited dwelling house.'" (Tessman, supra, 223 Cal.App.4th at p. 1298; see also People v. Little (2012) 206 Cal.App.4th 1364, 1368-1370.)

Here, the homeowner testified she and her daughter lived in the house. While the house was in the process of being sold, they routinely spent weekends at a relative's house to facilitate the potential buyers' ability to see the house, but this does not negate the fact they still lived there. "[A] building which is in current use as living quarters but from which the owner is temporarily absent is inhabited." (People v. Lewis (1969) 274 Cal.App.2d 912, 918-919.) The homeowner's belongings also remained at the house, she was there the morning of the burglary before heading to the relative's house for the weekend, and she did not move out until after the burglary, when the sale fell through and she decided to rent out the house rather than sell it.  As in Tessman, supra, 223 Cal.App.4th 1293 the house was inhabited for purposes of the burglary statutes.

Nevertheless, defendant argues the facts of this case are more similar to those in People v. Cardona (1983) 142 Cal.App.3d 481 (Cardona) and People v. Burkett (2013) 220 Cal.App.4th 572 (Burkett ). In Cardona, the Court of Appeal reduced a first degree burglary conviction to second degree burglary where the former residents of the house that was burglarized moved out of that house the day before the burglary and "did not intend ever to spend another night at [that] house." (Cardona, supra, at p. 482.) In Burkett, a divided panel of this court similarly reversed a first degree burglary conviction in favor of second degree burglary where the former resident of the house that was burglarized moved out two days before the burglary

and spent the intervening day painting and cleaning the house in preparation for the homeowner to move back in, but that homeowner did not intend to move his family into the house until two days after the burglary occurred. (Burkett, supra, at p. 575.) We explained: "Here, there is no evidence that the burglarized residence was inhabited, that it was *currently* being used by someone for dwelling purposes. Under established California precedent, it is not enough to show the home was suited for use as a residence and its owner had declared his [or her] intent to move in or that it had been recently used or would be imminently used. Nor is there evidence that its owner was merely away temporarily." (Id. at p. 582, italics added.)

Contrary to defendant's argument on appeal, unlike either Cardona or Burkett, there is substantial evidence the homeowner and her daughter still lived at the house at the time it was burglarized. The fact that other witnesses testified it "appeared to be vacant" from the outside is immaterial. The determinative question is whether or not the homeowner intended to use the house as a residence. As we have already explained, her testimony that she and her daughter lived there, coupled with the presence of their belongings in the house, provides more than sufficient evidence in this regard. Nor does defendant provide any support in the record for his assertion that "she must have been staying at [the relative's house] more often than not" at the time the burglary occurred. And, more importantly, he does not provide any legal authority supporting a conclusion that this purported fact would matter. Indeed, a vacation home has been held to be an inhabited dwelling for purposes of the burglary statutes despite the fact people generally inhabit their primary home more often than they inhabit their vacation home. (See Burkett, supra, 220 Cal.App.4th at p. 580 ["both homes contain personal items, and potential for personal harm from outside intrusion exists in both homes"].)

Sufficient substantial evidence supports defendant's conviction for first degree burglary.

People v. Torres, slip op. at 9-11.

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved

15

any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

As the Supreme Court has stated,

> Jackson . . . makes clear that it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

Here, the decision of the California Court of Appeal is both reasonable and supported by the record. This court is bound by the state appellate court's determination that the homeowner's testimony that she and her daughter lived there, along with the presence of their belongings in the house,[3] was substantial evidence the home was inhabited under California state law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) (a fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

Viewing the record in the light most favorable to the prosecution, a rational trier of fact could have found true beyond a reasonable doubt that the house where the offense occurred was an inhabited dwelling. The contrary evidence petitioner points to was before the jury, who assessed all of the evidence. This court is precluded from re-weighing the evidence or re-assessing witness credibility.[4] Schlup v. Delo, 513 U.S. 298, 330 (1995). While it might have

---

[3] See testimony of homeowner Shabanou Cashkouli. (ECF No. 21-3 at 88-89, 91, 93, 94-95, 98 (direct); 95-96 (cross examination); 111-12 (re-direct); 112 (recross-examination).)

[4] It is also well-settled under federal law, like California law, that the testimony of even a single witness is sufficient to support a conviction under the Jackson standard. See, e.g., Bruce v. Terhune, 376 F.3d 950, 957-58 (9th Cir. 2004) (testimony of single witness sufficient to uphold

been possible to draw a different inference from other evidence, this court is required to resolve any conflict in favor of the prosecution. See Jackson, 443 U.S. at 326.

"When the deference to state court decisions required by § 2254(d) is applied to the state court's already deferential review," Cavazos, 565 U.S. at 7, the court finds that the state court's decision denying petitioner's sufficiency of evidence claim with respect to the inhabited dwelling element was not contrary to, or an unreasonable application of, clearly established federal law. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." Richter, 562 U.S. at 103. Accordingly, petitioner is not entitled to habeas relief on his third claim, and it should be denied.

VI. Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may

////
////
////

---

conviction under Jackson); United States v. McClendon, 782 F.2d 785, 790 (9th Cir. 1986).

waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: October 27, 2020

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/torr3136.157